Thomas E. EGAN, Petitioner,

v.

DEPARTMENT OF the NAVY, Respondent.

Appeal No. 86–579.

United States Court of Appeals, Federal Circuit.

Oct. 1, 1986.

William J. Nold, Nold, Mosley, Clare, Hubbard & Towns, Louisville, Ky., for petitioner.

Robert A. Reutershan, Asst. Director, Commercial Litigation Branch, Dept. of Justice, Washington, D.C. argued for respondent. With him on the brief were Richard K. Willard, Asst. Atty. Gen. and

David M. Cohen, Director. Lt. Cdr. Claude Goddard, Judge Advocate General's Corps, Office of Counsel, Office of Civilian Personnel Management, Dept. of Navy, Washington, D.C. of counsel.

Stuart A. Kirsch and Mark Roth, Gen. Counsel, American Federation of Government Employees, AFL–CIO, College Park, Md., was on the brief, for amicus curiae, Ralph B. Bogdanowicz.

Before MARKEY, Chief Judge, PAULINE NEWMAN, Circuit Judge, and SWYGERT, Senior Circuit Judge.*

PAULINE NEWMAN, Circuit Judge.

Thomas E. Egan seeks review of a final decision of the Merit Systems Protection Board ("Board"), sustaining his removal from employment by the Department of the Navy ("agency"). *Egan v. Department of the Navy*, 28 M.S.P.R. 509 (1985). We vacate the Board's decision and remand for further proceedings.

*Background*

Mr. Egan was appointed to a Veterans Readjustment Appointment effective November 29, 1981 as a laborer, WG–3502–03, at the Trident Naval Refit Facility in Bremerton, Washington. A condition precedent to the retention of his employment was "satisfactory completion of security and medical reports", as shown on his Standard Form (SF)–50. A National Agency Check Investigation was initiated at the time of Mr. Egan's appointment. Mr. Egan was thereafter assigned to the "noncritical-sensitive"[1] position of laborer leader, WL–3502–03, on April 18, 1982.

On February 16, 1983 the Director of Naval Civilian Personnel Command issued a notice of the agency's intention to "deny/revoke" Mr. Egan's security clearance. The notice stated that agency regulations require[ ] this Command to adjudicate information on civilian personnel to determine their eligibility for a security clearance and/or assignment to sensitive duties. A determination is based on the individual's loyalty, reliability, trustworthiness, and judgment. Information contained in personal security investigations and from other relevant sources is used in making the determination.

The notice also stated that "[i]f a final adverse security determination is made by this Command, an individual will not be assigned to sensitive duties", and that Mr. Egan's access to classified information was suspended until a final determination was made.

The stated reason for this action was the existence of various California and Washington state criminal records showing, *inter alia*, Mr. Egan's convictions for second degree assault and for being a felon in possession of a pistol. The agency stated that Mr. Egan had failed to list, on his Personnel Qualifications Statement (SF–171) of September 7, 1981, two previous convictions for carrying a loaded firearm. The agency also referred to Mr. Egan's sworn statement of August 5, 1982 concerning his past drinking habits, and to the fact that he had spent the final twenty-eight days of one sentence at an alcohol rehabilitation program.

Mr. Egan was given an opportunity to reply in writing "to explain, mitigate or refute" the stated reasons for the action. Mr. Egan's designated representative Richard A. Brown, President of the International Association of Machinists Nipsic Lodge No. 282, provided a written reply dated May 6, 1983. In brief, this reply stated that Mr. Egan did not list certain of the charges referred to by the agency because he had not been found guilty of the charges, because they had been dismissed, or because they had occurred outside of the

---

* The Honorable Luther M. Swygert, Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit, sitting by designation. 28 U.S.C. § 291 (1982).

1. "Noncritical-sensitive" positions are defined by the agency to include positions involving "[a]ccess to Secret or Confidential information". OPNAVINST 5510.1F, paragraph 16–101.-2.b.

seven year time period designated in the employment application. The reply stated that the two convictions within the last seven years were listed in his application and that Mr. Egan's debt to society for these offenses had been paid in full. In addition to explaining the factual circumstances of some of the charges, the reply stated that alcohol had not been a problem for Mr. Egan for more than three years. The reply included favorable statements from Mr. Egan's supervisors as to his background and character.

On May 27, 1983 the Director of Naval Civilian Personnel Command issued its final determination:

> ▉ The information provided by you does not sufficiently explain, mitigate, or refute the reason(s) on which the intended denial/revocation action is based. Accordingly, your security clearance is denied/revoked effective today. As a result of this determination, you are not eligible to occupy a sensitive position with the Department of the Navy.
>
> 3. The activity head will annotate your OPNAV Form 5520/20 (Certificate of Personnel Security Investigation, Clearance and Access)....

On June 17, 1983 the agency issued a notice of proposed removal "for failure to meet the requirements of your position due to denial of your security clearance". The notice stated that his position required "a security clearance due to access to classified information regarding arrival/departure of submarines and access to classified/restricted areas or equipment aboard the submarines" and that maintenance of a security clearance was a mandatory condition of employment "necessary to ensure the security of classified defense information from potential espionage efforts by hostile foreign powers". Reassignment to a nonsensitive position was not feasible at the facility.

Mr. Egan did not respond orally or in writing to the notice of proposed removal, and on July 15, 1983 the agency issued its final decision to remove Mr. Egan.

Mr. Egan filed a timely appeal to the Board. On December 22, 1983, the presiding official reversed the agency's decision. The presiding official reviewed the standards for evaluating an agency's denial of an employee's security clearance:

> As a logical first step the agency must initially establish the standard for obtaining a security clearance by showing the specific criteria used to determine whether to deny, grant, or revoke the security clearance. Additionally, in order to avoid arbitrary or perfunctory decisions, it must show that these criteria are rationally related with those concerns connected with our national security. *See Schwartz v. United States Department of the Army*, [16 M.S.P.R. 642 (1983)], citing *Hoska* [*v. United States Department of the Army*, 677 F.2d 131, 138 (D.C.Cir.1982)]. Any subsequent investigation of an employee should be evaluated within the framework of these criteria. As a result of its investigation an agency must be able to show how an employee's alleged misconduct has an actual or potentially detrimental effect on national security interests. The final decision made on the basis of such an evaluation must be "reasonable and warranted." *Schwartz*, [16 M.S.P.R. at 644].

Applying these standards, the presiding official stated that it was "impossible" to determine whether the agency's decision was "reasonable" because the agency failed to "establish what specific criteria are used to determine whether to deny, grant, or revoke an employee's security clearance, or to prove that such criteria are rationally related to our national security". Despite warnings by the presiding official concerning deficiencies in the evidence and the agency's burden of proof, the agency had elected to rely solely on the conclusory statements in its letters of proposed and final denial of clearance and on the allegations in its brief, unsubstantiated by evidence.

The presiding official also held that the agency "failed to present any evidence showing it conscientiously weighed the cir-

cumstances surrounding appellant's alleged misconduct and reasonably balanced it against the interests of national security", including whether Mr. Egan actually concealed prior offenses on his SF–171, whether offenses for which Mr. Egan had been arrested but subsequently found not guilty had been considered as proof of his misbehavior, and whether the statements from Mr. Egan's supervisors had been considered.

The agency petitioned for review of the presiding official's decision by (1) challenging the Board's authority to review the merits of a security clearance denial; (2) alleging error in the presiding official's assessment of the evidence submitted; and (3) assuming *arguendo* that the Board had authority to review the merits of the denial and that the agency had failed to meet its burden of proof, contending that the appropriate remedy was not to reverse the removal but to remand the case to the agency to correct any errors. *Egan,* 28 M.S.P.R. at 512.

The Board, having before it numerous petitions for review containing issues of law common to those in *Egan,* solicited *amicus* briefs on issues (1) and (3) above, 49 Fed.Reg. 48,623–24 (1984), and on the following supplemental question:

C. When an agency wishes to base an action listed in 5 U.S.C. 7512 on the revocation of security clearance, may it do so pursuant to 5 U.S.C. 7513, or is 5 U.S.C. 7532 the exclusive basis for such an action?

50 Fed.Reg. 2,355 (1985).

Twelve *amici* filed briefs. The Board treated *Egan* as the lead case concerning the Board's authority in security clearance cases. After discussing the statutory framework, the relevant case law, and the arguments and policy considerations raised by the parties and the *amici,* the Board rejected its previous decision in *Bogdanowicz v. Department of the Army,* 16 M.S.P.R. 653 (1983), which in turn implemented the D.C. Circuit's decision in *Hoska v. United States Department of the Army,*

677 F.2d 131 (D.C.Cir.1982). The Board decided:

[I]n an adverse action over which the Board has jurisdiction and which is based substantially on the agency's revocation or denial of a security clearance, the Board has no authority to review the agency's stated reasons for the security clearance determination. However, the Board will review the procedures utilized by the agency to ensure that the agency afforded the appellant procedural due process.

*Egan,* 28 M.S.P.R. at 519. The Board continued:

We further hold that the minimal due process rights that must be afforded the employee upon the agency's denial or revocation of a security clearance are: notice of the denial or revocation; a statement of the reason(s) upon which the negative decision was based; and an opportunity to respond.

The nature of Board review in such cases, therefore, will be limited to determining that the agency has established the following: (1) the requirement of a security clearance for the position in question; (2) the loss or denial of the security clearance; (3) and the granting of minimal due process protections to the employee.

*Id.* at 519–20.

The Board held that it "has no authority to order reinstatement of a security clearance", that 5 U.S.C. § 7532 "is not the exclusive basis for removals based upon security clearance revocations", and that the appropriate remedy if the Board finds that the agency failed to afford an appellant procedural due process rights is to "reverse the adverse action and to order the agency to restore the appellant to pay status". *Id.* at 520–21. However, in such case the agency may reinitiate the removal action after providing the employee minimal due process protection. *Id.* at 522.

Applying this new standard to the facts of Mr. Egan's case, the Board held that the presiding official erred in reviewing the merits of the agency's denial of Mr. Egan's

security clearance. As the agency had shown that a security clearance was required for Mr. Egan's position, that his removal was based on the agency's denial of his security clearance, and that he had received the minimal due process of notice and an opportunity to respond before the agency, the Board reversed the presiding official and sustained the agency's removal action. *Id.* at 522–23. The Board did not address the agency's remaining allegations of error committed by the presiding official.

The Board has applied the *Egan* standard in subsequent cases wherein an agency denied or revoked an employee's security clearance, the Board refusing to review the merits of the agency's action. Several of these cases are on appeal to this court and have been stayed pending resolution of this appeal. The petitioner in one such appeal, *Bogdanowicz v. Department of the Army*, Appeal No. 86–510, has filed an *amicus* brief in this court.

## Analysis

### I.

Review of the Board's decision starts with the statutes defining the Board's authority.

The Board is required to "hear, adjudicate, or provide for the hearing or adjudication, of all matters within the jurisdiction of the Board". 5 U.S.C. § 1205(a)(1). In 5 U.S.C. §§ 7512(1) and 7513(d) Congress assigned the Board appellate review of removal actions taken against "employees" pursuant to subchapter II of Chapter 75.

The statute provides in 5 U.S.C. § 7532 for the exclusion from Board review of agency actions against employees in national security matters, and establishes a procedure for such actions. Mr. Egan's removal was not taken under that provision.

The statute provides no exclusion from Board review of removals under 5 U.S.C. § 7513(a), the provision under which Mr. Egan was removed on the ground of failure to receive a job-required security clearance. We have found no indication in the legislative history of the Civil Service Reform Act that such a removal action if taken under § 7513(a) was intended to be exempt from Board review, and the government has not asserted that Congress so intended.

Section 7532 of Chapter 75 provides an alternative mechanism, expressly excluded by 5 U.S.C. § 7512(A) from appellate review by the Board, for suspension and removal of an employee in the interest of national security. This procedure was available to the Department of the Navy. *See* 5 U.S.C. §§ 102, 7531(5). The legislative history of 5 U.S.C. § 7512 states that "[a]dditional exceptions conforming this section to other provisions in title V cover employees subject to section 7532 (national security)" as well as other categories of employees. S.Rep. No. 969, 95th Cong., 2d Sess. 50, *reprinted in* 1978 U.S.Code Cong. & Ad.News 2723, 2772. The Board does not state that Mr. Egan is in any excluded category.[2]

An employee removed in the interest of national security by application of section 7532 is entitled to certain procedures within the agency, including a hearing at the employee's request and review by the head of the agency or his designee. The determination of the head of the agency is final and is not reviewable by the Board. The basic procedures are set out in the statute:

§ 7532. Suspension and removal

(a) Notwithstanding other statutes, the head of an agency may suspend without pay an employee when he considers that action necessary in the interests of

---

**2.** The person who has been denied a security clearance must be an "employee" as defined by 5 U.S.C. § 7511(a)(1). This excludes, *inter alia*, probationary employees and non-preference eligibles in the excepted service, employees in the Federal Bureau of Investigation, 28 U.S.C. § 536, and members of the uniformed services, 5 U.S.C. §§ 2101–

02. Civilian personnel in the Defense Intelligence Agency, Central Intelligence Agency, and the National Security Agency can be exempt from the procedural rights granted under 5 U.S.C. § 7513 pursuant to statute. *See* 5 U.S.C. § 2302(a)(2)(C)(ii); 10 U.S.C. § 1604(e)(1); 50 U.S.C. §§ 403(c), 833(a).

national security. To the extent that the head of the agency determines that the interests of national security permit, the suspended employee shall be notified of the reasons for the suspension. Within 30 days after the notification, the suspended employee is entitled to submit to the official designated by the head of the agency statements or affidavits to show why he should be restored to duty.

(b) Subject to subsection (c) of this section, the head of an agency may remove an employee suspended under subsection (a) of this section when, after such investigation and review as he considers necessary, he determines that removal is necessary or advisable in the interests of national security. The determination of the head of the agency is final.

(c) An employee suspended under subsection (a) of this section who—

(1) has a permanent or indefinite appointment;

(2) has completed his probationary or trial period; and

(3) is a citizen of the United States; is entitled, after suspension and before removal to—

(A) a written statement of the charges against him within 30 days after suspension, which may be amended within 30 days thereafter and which shall be stated as specifically as security considerations permit;

(B) an opportunity within 30 days thereafter, plus an additional 30 days if the charges are amended, to answer the charges and submit affidavits;

(C) a hearing, at the request of the employee, by an agency authority duly constituted for this purpose;

(D) a review of his case by the head of the agency or his designee, before a decision adverse to the employee is made final; and

(E) a written statement of the decision of the head of the agency.

The Supreme Court stated in *Cole v. Young*, 351 U.S. 536, 551, 76 S.Ct. 861, 870, 100 L.Ed. 1396 (1956), that an employee can be dismissed under this section (its text was substantially identical under the predecessor Civil Service Act) only if he or she occupies a "sensitive" position and the agency head determines that the position "is one affected with the 'national security.'" *Id.*

Mr. Egan's position was classified as "noncritical-sensitive". The letter of proposed removal stated that Mr. Egan's removal for failure to qualify for a security clearance was "necessary to ensure the security of classified defense information from potential espionage efforts by hostile foreign powers". *See Cole*, 351 U.S. at 544, 76 S.Ct. at 867 ("national security" is intended to cover "only those activities of the Government that are directly concerned with the protection of the Nation from internal subversion or foreign aggression"). The agency does not argue that it could not have removed Mr. Egan pursuant to the provisions of 5 U.S.C. § 7532, and thereby have avoided Board review.

The agency chose, however, to remove Mr. Egan pursuant to 5 U.S.C. § 7512. We therefore reach the basic question raised by the Board, i.e., whether 5 U.S.C. § 7532 is the exclusive basis for removal based on national security grounds. We conclude, as did the Board, that it is not.

There is nothing in the text of section 7532 or its legislative history to suggest that its procedures were intended to preempt section 7513 procedures whenever the removal could be taken under section 7532. The language of section 7532 is permissive, stating that the head of the agency "may" suspend and remove an employee under that section. The Court in *Cole* recognized that employees under the Lloyd-LaFollette and Veterans' Preference Acts could be dismissed on loyalty grounds without proceeding under the earlier counterpart to section 7532. *Cole*, 351 U.S. at 543–44, 76 S.Ct. at 866–67.

■ We conclude that Congress intended to provide the agencies with procedural flexibility in effecting the removal of government employees on national security grounds, and that such removal may be

brought under either section 7512 or section 7532. The agency is responsible for selecting the removal procedure in the particular circumstance. Each procedure will entail different benefits and burdens for both the agency and the employee.

Having chosen to remove Mr. Egan under section 7512 rather than section 7532, the agency has chosen the procedure that carries Board review under section 7513.[3] We thus turn to the questions of the scope and standard of the Board's review.

## II.

The Board held that it had no authority to review the agency's reasons for the security clearance determination. The Board held that it did have authority to review the procedures utilized by the agency, to the limited extent appropriate to determine whether the agency afforded Mr. Egan "minimal due process", as this was defined by the Board. *Egan*, 28 M.S.P.R. at 519–20.

■ We have been directed to no statutory support for this new procedure. We agree that the Board is responsible for ensuring that an employee receives due process; however, the Board is also responsible for conducting, not abdicating, its other statutory responsibilities. This includes, absent contrary congressional authorization, the obligation under 5 U.S.C. § 7701 to review agency actions taken under subchapter II of Chapter 75.

5 U.S.C. § 7701(c)(1)(B) provides that the Board will determine whether the agency's decision is supported by a preponderance of the evidence. Section 7701 contains no exception from such review if the decision is based upon denial of security clearance; unless, of course, the decision is made by the agency under section 7532. The absence of any statutory provision precluding appellate review of security clearance denials in section 7512 removals creates a strong presumption in favor of appellate review. *See Abbott Laboratories v. Gard-*

*ner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967) ("only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should courts restrict access to judicial review").

In *Hoska v. United States Department of the Army*, 677 F.2d 131 (D.C.Cir.1982), that court reviewed on its merits a Board decision based on its full review of the agency's revocation of the petitioner's security clearance, wherein the Board had itself reviewed the agency's decision and held that the removal was supported by a preponderance of the evidence. The D.C. Circuit held that the evidence presented was inadequate to support the decision and remanded the case with instructions to order appropriate relief, including reinstatement, backpay, and reissuance of the petitioner's security clearance. The Board now repudiates *Hoska*, and its own precedent, not on the merits but on the procedural ground that the D.C. Circuit did not "expressly address the Board's authority to review the underlying reasons for the agency's security clearance determination", and also that that opinion is not binding upon the Board. *Egan*, 28 M.S.P.R. at 516 & n. 4.

The Board, discussing its "misplaced" reliance on *Hoska*, stated:

> [T]he Board ... would inevitably be faced with agency exposition of highly sensitive materials and Board determinations on matters of national security. We find that the underlying national security considerations inherent in a security clearance determination involve such a degree of sensitivity that we should not infer jurisdiction over that determination, particularly in light of Executive Order 10450, which commits such actions to agency discretion.

*Egan*, 28 M.S.P.R. at 518 (footnote omitted). Exec. Order No. 10,450, 3 C.F.R. 936 (1953), *reprinted as amended in* 5 U.S.C. § 7311 note, provides in section 2 that:

---

3. It is not material, as the dissent argues, that Mr. Egan could have sought review within the Navy as provided by OPNAVINST 5510.-

1F, paragraph 16–105.1.d. Mr. Egan still had the right to appeal his removal to the Board as set forth in 5 U.S.C. § 7513.

The head of each department ... shall be responsible for establishing and maintaining ... an effective program to insure that the employment and retention in employment of any civilian officer or employee within the department ... is clearly consistent with the interests of national security.

The Executive Order does not address appellate review of an agency's grant or denial of security clearance, although it discusses the factors to be weighed to determine whether a person's employment is consistent with the interests of national security. *Id.* at § 8. The Executive Order establishes responsibilities within the executive branch, and is entirely consistent with the civil service laws before us. It does not purport to preclude the application of these laws.[4]

The Board observed in *Egan* that it generally "has the authority to review the merits of the case, including the merits of the underlying reasons upon which the adverse action is based". *Egan,* 28 M.S.P.R. at 517 n. 5. Matters of agency administrative discretion have not been immune from Board review. For example, in *Ketterer v. U.S. Department of Agriculture,* 2 MSPB 459, 2 M.S.P.R. 294 (1980), the Board held that it would review the agency's basis for a reassignment where the employee's refusal to accept reassignment resulted in his removal. In *Bavier v. Department of Transportation,* 5 MSPB 73, 4 M.S.P.R. 548 (1981), the Board held that the agency must show the propriety of its decision to deny leave to sustain its charge of absence without leave. In *Huber v. Merit Systems Protection Board,* 793 F.2d 284 (Fed.Cir. 1986), the Board reviewed the agency's denomination of its action as a reduction in force for jurisdictional and relief purposes. *See also Losure v. Interstate Commerce Commission,* 2 MSPB 361, 2 M.S.P.R. 195

(1980). In *Brewer v. American Battle Monuments Commission,* 779 F.2d 663 (Fed.Cir.1985), this court held that the Board had authority to review a reassignment that accompanied a reduction in grade. All of these cases involve Board review of intrinsically agency-committed discretionary decisions.

The Board correctly states that there are some actions that it is restrained from reviewing on the underlying merits, namely military assignments, criminal convictions, and bar decertifications.

In *Zimmerman v. Department of the Army,* 755 F.2d 156, 157 (Fed.Cir.1985), this court affirmed that "the Board does not have the jurisdiction to examine military assignments and transfers." In *Buriani v. Department of the Air Force,* 777 F.2d 674, 677 (Fed.Cir.1985), we held that the Board could not review an Air Force refusal to promote a member of the Air Force Reserves, although failure to attain promotion resulted in the loss of active reserve membership, a condition of the employee's civilian employment. *Zimmerman* and *Buriani* turn on the long-established premise that "[t]he military constitutes a specialized community governed by a separate discipline from that of the civilian" and that it is not the role of the judiciary to intervene in the orderly execution of military affairs. *Orloff v. Willoughby,* 345 U.S. 83, 94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953). The civil service laws do not cover military service, see 5 U.S.C. §§ 2101–02; these decisions affirming that restraint do not control Mr. Egan's situation. Mr. Egan was not a member of the military forces, nor was he a dual status employee in the active reserves. The reasons for refraining from judicial review

---

**4.** Although the dissent states that the Executive Order removed security matters from the civil service laws, by analogy to the military who (by statute) are not covered by the civil service laws, we observe that they coexisted in harmony from 1953 to 1985. The Executive Order instructs agency heads to establish and administer a security program;

the civil service laws establish statutory procedures for removal of employees. Indeed, 5 U.S.C. § 7532, specific to removal of employees in the interest of national security, has its origin in a law enacted in 1950. It is a truism that the Executive can not by Order vacate an Act of Congress.

exemplified in *Zimmerman* and *Buriani* are not here present.

Security clearances of course are not limited to employees in the military departments; other agencies such as the Department of Commerce or the Department of Energy may also require such clearance. Neither the Executive Order nor the statutes draws a distinction between civilian employees of military and non-military agencies, and it is apparent from the panoply of laws and regulations that such distinction was not intended. Even in the military context, in *Mindes v. Seaman*, 453 F.2d 197, 201 (5th Cir.1971), a case heavily relied on by the Board and the agency, the court in referring to the policy of nonreview of military matters recognized that internal military affairs could be reviewed by the courts upon allegation of the deprivation of a constitutional right or that the military had acted in violation of applicable statutes and regulations, after exhaustion of available intraservice corrective measures.

The Board also relies on cases relating to criminal convictions and bar decertification, where it refused to allow collateral attack on those underlying reasons for the agency's adverse action. *See, e.g., Crofoot v. United States Government Printing Office*, 21 M.S.P.R. 248, 252 (1984), *rev'd on other grounds*, 761 F.2d 661 (Fed.Cir.1985) (Board does not examine reasons behind criminal conviction to determine guilt or innocence); *McGean v. National Labor Relations Board*, 15 M.S.P.R. 49, 53 (1983) (Board does not examine reasons for bar decertification where employee is removed for failure to maintain bar membership). These decisions are distinguished on the simple ground that they relate to collateral attack on the decisions of other tribunals. The criminal conviction in *Crofoot* and the bar decertification in *McGean* were not federal agency actions; they were actions of entirely separate regulation or enforcement, in which the agency removing the employee had no role.

A person can obtain review of the underlying facts pertinent to criminal conviction or loss of bar certification by appropriate judicial process. In Mr. Egan's case, as decided by the Board, the agency that removed him achieves a complete absence of appellate review of the underlying facts by any tribunal at all, merely by referring to the national security, whether or not that is a supportable reason for the removal.

It is apparent that where national security considerations are involved, safeguards of sensitive information, if sensitive information is critical to the case, may be required in reviewing the agency's decision. But overstatement infects the Board's position that "it would inevitably be faced with agency exposition of highly sensitive materials". *Egan*, 28 M.S.P.R. at 518. No such materials were asserted in Mr. Egan's appeal before the presiding official. The Board's decision to refrain from review of all such actions taken under 5 U.S.C. § 7512 does not distinguish between sensitive and nonsensitive cases. We consider it of compelling weight that, if sensitive information is involved in the case, the agency has available the procedures of 5 U.S.C. § 7532 and the avoidance of all non-agency review.

Mr. Egan was not removed for national security reasons under section 7532 but for cause under section 7512. The basis for the agency's adverse determination as to his "loyalty, reliability, trustworthiness, and judgment" was not "unknown and unknowable", as the agency now claims, but was pursuant to specific criteria in the agency's own regulations, *viz.:*

    h. Criminal or dishonest conduct.

    i. Deliberate false statement, deception or fraud in applying for enlistment or appointment or in providing information in connection with a security clearance or assignment to a sensitive position.

    j. Habitual or episodic use of intoxicating beverages to excess.

    k. Abuse of, or addiction to, narcotics, drugs, or other controlled substances.

    \*     \*     \*     \*     \*     \*

m.   Any facts, circumstances, or conduct that indicates poor judgment, unreliability, or untrustworthiness, thereby suggesting that the person concerned might fail to safeguard classified information, deliberately or inadvertently, or may not be suitable for assignment to sensitive duties.

\*      \*      \*      \*      \*      \*

p.   Refusal or intentional failure to provide material facts in a personal history statement or security form. . . .

OPNAVINST 5510.1F, paragraph 16–102.2. As in *Hoska,* 677 F.2d at 136, the agency's security determination was designed to be "an overall, commonsense determination based on all available information". OPNAVINST 5510.1F, paragraph 96–102.1. There is no dearth of agency regulation, rule, or guideline for security determinations; and in Mr. Egan's case he was informed in lengthy detail of the reasons why his clearance was denied. As demonstrated in *Bogdanowicz, supra,* the Board is capable of reviewing the record to decide if the agency has established by appropriate standard that the employee should be denied security clearance.

Similarly, the Board's determination of a nexus between the criteria set out in the agency's regulations and the employee's ability to safeguard classified information is not unlike other nexus determinations. The Board has upheld the removal of employees found to have falsified employment applications or to have criminal or alcoholism records, in many contexts in addition to that of national security. The statute and regulations require the Board to review adverse actions, except for those taken under 5 U.S.C. § 7532, for the purpose of promoting the efficiency of the service. It is incongruous to assert, as does the dissent, that the Board is incapable of reviewing an agency's decision based on loyalty, trustworthiness, or veracity, and therefore that the intent of Congress in enacting both § 7512 and § 7532 must be ignored.

In sum, the Board is required to review the agency action taken against Mr. Egan with the same full process and standards and scope of review, established by law and precedent, as any other adverse action taken under section 7512.

## III.

The Board's decision in *Egan* creates the anomalous situation whereby employees removed for national security reasons under 5 U.S.C. § 7512 would be entitled to less process than those removed under 5 U.S.C. § 7532. As discussed above, employees removed under section 7532, although denied Board review, are entitled to a full evidentiary hearing within the agency. Under the Board's decision, Mr. Egan would be given only a written right of reply and neither an agency hearing nor a right of review by the Board on the merits. Mr. Egan and those similarly situated would lose their statutory right to both a hearing and a review of the merits of the agency action if the agency elects removal under section 7512.

The procedure designed by the Board, which the Board characterizes as "minimum due process", is a departure from the Civil Service Reform Act's careful balance of employer and employee interests. This procedure would evict a large class of federal employees from the statutory safeguards that this Act provides. Minimum due process under this Act requires not only minimal pre-termination procedures, *see Mercer v. Department of Health and Human Services,* 772 F.2d 856 (Fed.Cir. 1985), but also requires a post-termination hearing as provided in 5 U.S.C. § 7701(a)(1). As discussed in *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), federal employee due process requires a full evidentiary hearing at some point in the termination proceedings, if not before removal, then after. *See also Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 1496, 84 L.Ed.2d 494 (1985). The *Arnett* Court stated that an employee's "liberty" interest in removing "any wrongful stigma from his reputation" may be offended by dismissal based on an unsupported charge:

Since the purpose of the hearing in such a case is to provide the person "an opportunity to clear his name," a hearing afforded by administrative appeal procedures after the actual dismissal is a sufficient compliance with the requirements of the Due Process Clause.

416 U.S. at 157, 94 S.Ct. at 1646 (plurality opinion).[5]

This right to a hearing is particularly cogent in the security clearance context. In Mr. Egan's case, the agency's regulations provided that "[f]inal adverse personnel security actions based on Defense Investigative Service (DIS) investigations shall be reported to DIS for recording in the Defense Central Index of Investigations...." OPNAVINST 5510.1F, paragraph 16–105.6. This record will make it difficult, perhaps impossible, for Mr. Egan to obtain future government employment. *See* 5 C.F.R. § 732.401. Unlike the situation in *Nesmith v. Fulton,* 615 F.2d 196, 200 n. 6 (5th Cir.1980), discussed by the dissent, the information is not in the Navy's private files but in a separate (DIS) file made available to OPM and other agencies upon request. This information will also be used if Mr. Egan seeks employment requiring security clearance in the private sector, under the Department of Defense Industrial Personnel Security Clearance Program. *See generally* 32 C.F.R. Parts 155–56, 361.

Not in point is *Cafeteria & Restaurant Workers Union, Local 473, AFL–CIO v. McElroy,* 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), cited by the dissent, where the person involved was not a government employee, and was therefore not entitled to the statutory rights of government employees as set out in Title 5. The Court stated that this was "not a case where government action [exclusion from the premises] has operated to bestow a badge of disloyalty or infamy, with attendant foreclosure from other employment opportunity." *Id.* at 898, 81 S.Ct. at 1750. The Court also observed that no one had accused the petitioner of being "disloyal". *Id.* at 898–99, 81 S.Ct. at 1750. The same cannot be said for Mr. Egan.

Although the dissent justifies Mr. Egan's removal without either a pre-termination or post-termination hearing, on a catalog of Mr. Egan's alleged transgressions, the merits have not yet been reviewed by the Board, and are not before us. The facts of Mr. Egan's case may indeed lead the Board to affirm the agency's action. That decision has not yet been made.

The Board, by refusing to review an agency's reasons for refusal of security clearance, denies to those federal employees the minimal opportunity to correct agency error, or to be protected from specious, arbitrary, or discriminatory actions.[6] The Board thus violates the congressional mandate that it "protect the rights of employees, recognized by the Supreme Court in *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), to a full and fair consideration of their case". S.Rep. No. 969, 85th Cong., 2d Sess. 51, *reprinted in* 1978 U.S.Code Cong. 2723, 2773.

## IV.

The question raised by the agency as to remedies available to it should the Board order reinstatement, following reversal of an agency removal, is not ripe for judicial review. On remand from this court, the Board may affirm the agency's removal of Mr. Egan on the merits—a plau-

---

**5.** Justices Powell and Blackmun concurred on this point. 416 U.S. at 170, 94 S.Ct. at 1652. Justice White dissented in part due to the agency's failure to provide an impartial hearing officer at the pretermination hearing, but he agreed that the full trial-type hearing need not occur prior to the employee's termination. *Id.* at 185–86, 200–202, 94 S.Ct. at 1659–60, 1666–1667.

**6.** The *amicus* points out that the Board's decision in *Egan* would also enable an agency to deny or revoke a security clearance as a means of effecting a prohibited personnel practice, without agency hearing, Board scrutiny, or judicial review, or as a means of circumventing more cumbersome procedures that provide greater safeguards to the employee.

sible possibility if the facts referred to by the agency are substantiated. Although the Board's decision stated that it would not review the factual underpinnings of Mr. Egan's security clearance denial, the Board remarked on Mr. Egan's criminal record and his past drinking problem. *Egan,* 28 M.S.P.R. at 523 & nn. 9–10. The Board refrained, in this apparent test case, from issuing a decision on the merits.[7]

By no procedure is the Navy required to retain an established security risk in a sensitive position. We deplore that the Navy took fifteen months to investigate Mr. Egan, whose criminal past was not only on the public record but on his employment form, meanwhile converting him from a probationary employee, who was not entitled to the safeguards here invoked, to a permanent one, who is. 5 U.S.C. §§ 7511(a)(1)(B), 7532(c)(1), 5 C.F.R. § 307.-105. The dissent denigrates the important issues before us when it calls this case "comic", and misstates that "the majority employs the mere fact that Egan was conditionally hired as the basis for creating a security clearance review role for the MSPB". The appellate review role of the MSPB was created by Congress, not this court. Further, the case on appeal is not that of a "conditional" employee. Federal Personnel Manual, Ch. 307–1–7c (1982); *Lavelle v. Department of Transportation,* 17 M.S.P.R. 8, 13 (1983); *Short v. Veterans Administration,* 7 MSPB 563, 8 M.S.P.R. 70, 72 (1981); *Smith v. Department of the Navy,* 4 MSPB 113, 4 M.S.P.R. 20, 22 (1980).

Appellate review may "punish" an agency (the dissent's word), if one so wishes to describe Congress' power to make laws governing federal employment, but such laws are of no less statutory force. *See, e.g., Vitarelli v. Seaton,* 359 U.S. 535, 79

S.Ct. 968, 3 L.Ed.2d 1012 (1959), wherein the Court held that a petitioner who could otherwise have been discharged was entitled to reinstatement when the national security exception procedures were not followed.

The dissent also maintains that our decision would entitle the Board to substitute its judgment for that of the employing agency as to which of its employees should be entrusted with our nation's secrets. This position misperceives the nature of the Board's role in Chapter 75 removal actions. The Board does not substitute its judgment for that of the employing agency, nor can the Board do so if the removal is based on the denial or loss of a security clearance. The Board is a review tribunal exercising appellate, not original, jurisdiction. 5 C.F.R. § 1201.3(a). This point has been made in a variety of circumstances, most often in the context of penalty determination. *See, e.g., Brewer v. United States Postal Service,* 227 Ct.Cl. 276, 647 F.2d 1093, 1098 (1981) ("we will defer to the judgment of the agency as to the appropriate penalty for employee misconduct, unless its severity appears totally unwarranted in the light of [relevant] factors"). While the choice of penalty is committed to the sound discretion of the agency, the Board will mitigate the agency's penalty when it is an abuse of discretion or clearly outside the bounds of reasonableness. *Miguel v. Department of the Army,* 727 F.2d 1081, 1083 (Fed.Cir.1984).

The determination that a given employee is a security risk is also committed to the sound discretion of the agency, in accordance with the standards set forth in its regulations. Where a nexus is not apparent, the agency's determination must not

---

7. The dissent states that the Board's only remedy is to reinstate Mr. Egan in his job, citing as authority two government contract cases. The dissent appears to assume that the Board, on its review of the merits, will necessarily determine that Mr. Egan should not have been removed; for if the Board affirms the agency, the dismissal will be upheld. The Board itself held in *Egan,* 28 M.S.P.R. at 522, that on remand the agency may reinitiate the removal action, citing *Doe v. Casey,* 601 F.Supp. 581, 589 (D.D.C. 1985) ("employee removed in violation of agency's procedures ordered returned to administrative leave status, which he occupied prior to removal, until granted procedural due process"); and of course the agency may invoke section 7532 and avoid all Board review.

be "arbitrary and perfunctory". *Hoska*, 677 F.2d at 138.

This case presents no new issues of Board review, and the Board's procedures will be no different than they have been during the years the Board has exercised the authority it now seeks to abdicate. The record does not show that any of the problems posited by the dissent occurred during that period. To the extent that Congress has authorized such review, it must continue to be implemented.

### Conclusion

We conclude that the heavy weight of law and precedent, congressional intent, and fundamental rights, require that the agency action taken in *Egan* receive the same appellate review as other adverse actions taken under 5 U.S.C. § 7512. The decision of the Board is vacated and remanded for proceedings consistent with this opinion.

VACATED AND REMANDED.

MARKEY, Chief Judge, dissenting.

Convinced that the Merit Systems Protection Board (MSPB) was never constituted a "security clearance review board", and that it should not by this court be so constituted, I most respectfully dissent.

A circumstance of grave import, ignored by the majority, is this: Egan does not challenge any fact in the listing of his 14 years of arrests and criminal acts and alcoholism—he simply disagrees with the Navy's evaluation, its *judgment*, made in light of those facts. Thus the majority is necessarily insisting that MSPB substitute *its* judgment on which employees should be entrusted with the Navy's nuclear submarine secrets and which should not. Indeed, the majority says MSPB has a "statutory responsibility" to do so (though no statute so states).[1]

Thus the majority here makes not an application of law but a choice of policy. That choice, I submit, is not only wrong but fraught with mischief. Further, I cannot find that the majority, in making that policy choice, engaged in the required balancing of Egan's interest in obtaining a clearance and the armed services' interest in fulfilling their assigned role of protecting national security.

No one has a constitutional right to be hired by the government. No one, not even one whose slate is unmarked, has a constitutional right to be granted a security clearance. Egan was conditionally hired to help repair submarines. His retention on the job was conditioned, as he knew, on whether those responsible for Navy security would grant him a security clearance. After a thorough review, all the way to the Director, Navy Civilian Personnel Command (NCPC) and after Egan had a chance to respond and to appeal to higher authority within the Navy,[2] the responsible office of the Navy declined to grant the security clearance.

Egan's immediate employing facility, Trident Naval Repair Facility (TNRF), because Egan did not get the required clearance and it had no other job for him, was forced to remove him, but Egan lost nothing to which he was entitled. If he had a property right in his job, it was a conditioned right.[3] All that happened was that

1. The *sole issue* presented to this court by a prolix Egan is "Whether the Merit Systems Protection Board Has the Statutory *Authority and Obligation to Review and Consider the Underlying Reasons for the Denial or Revocation of a Security Clearance* in the Appeal of an Adverse Action by the Employing Agency Where Said Action is Based Primarily on the Denial or Revocation of Said Clearance and Where the Merit Systems Protection Board Otherwise Has Jurisdiction." (Emphasis added.) Though Egan repeatedly refers to "denial or revocation," and though the issue of the board's authority to re-

view security clearances would encompass both, the record reflects only a "denial", not a "revocation".

2. The majority indicates, incorrectly, that Egan had no right to appeal within the Navy. He had that right, OPNAVINST 5510.-1F, 16–105 1d, but on this record simply chose not to exercise it.

3. The majority's reference to a "liberty interest" is misplaced. The Navy did not publicize its denial of Egan's security clearance.

the condition precedent to retention in his conditional employment did not occur.[4]

It did not occur because the Navy exercised its judgment and responsibility by declining to disclose its secrets to an employee with a history that included imprisonment for possessing a firearm as a felon on probation following a conviction for assault.[5]

### Fear of "Arbitrary" Denials

The majority decides a case not here. Like that of the presiding official, the majority's underlying rationale is a felt necessity to "protect" civilian employees against "arbitrary" denials of security clearances. *Amicus* and the majority see the boogymen of "specious, arbitrary, discriminatory" clearance denials, citing no evidence that those horror stories are factually based, supplying no description of how they could happen under OPNAVINST 5510.1F., and giving no reasons *why* those responsible for Navy security would want to engage in such chicanery, or why a due process review by MSPB would not serve to catch and rectify any denial of a clearance made without due process.[6]

Whence the fear of arbitrary denials? Whence the automatic refusal of even a modicum of at least initial trust in Navy officials? Whence the disregard of the process (denial response denial appeal final denial) conducted by the Navy under OPNAVINST 5510.1F before denying a clearance?

There is no evidence, and not even a claim, that any Navy official had any personal dislike of Egan. Indeed, he was hired and removed by TNRF, and his clear-

---

See *Nesmith v. Fulton,* 615 F.2d 196, 200 n. 6 (5th Cir.1980). Moreover, if Egan were defamed he has a remedy in another forum.

**4.** If the majority's position should escape Supreme Court review, the Navy, and the other armed services, would be well advised (at whatever cost to efficiency) to use only § 7532 or abandon the practice of hiring on condition that a security clearance be obtained. The alternative, under the majority's approach, is to have all denials of security clearances to civilians second guessed by MSPB (numerous appeals have already been stayed in this court).

In the present case (though hiring might have been substantially delayed), the Navy could have determined Egan's security status *before* hiring him, and, because Egan would never have become an "employee", MSPB would have had no jurisdiction, and the Navy would have entirely escaped MSPB supervision of its efforts to safeguard the country's security interests. If the Navy could accelerate its clearance review process, it could hire "on probation" and again escape MSPB supervision of its security decisions. If an employee sought a promotion to a "non-critical sensitive" position, and was denied a clearance (and thus the promotion) MSPB would have no jurisdiction. All of these considerations illustrate the comic nature of this case, in which the majority employs the mere fact that Egan was conditionally hired as the basis for creating a security clearance review role for the MSPB.

**5.** The Navy's denial of security clearances to sailors is immune from supervision by MSPB and this court. It is at best incongruous to insist that the Navy's denial of a security clearance to a civilian employee must not be immune from MSPB supervision. Civilians employed on nuclear submarines, and thus privy to secret equipment on board and to the Navy's highly sensitive submarine shipping and movement schedules, can do as much harm as any sailor assigned to operate those submarines. I have grave difficulty in seeing why the Navy should be forced to keep on its nuclear submarines civilian employees who, in its judgment and after careful consideration, it has decided it cannot safely trust, any more than it should be forced to keep sailors it cannot trust on its submarines.

I trust that in this I am not unduly influenced by the thought that no MSPB presiding official and no member of the board or of this court will have to serve on a submarine repaired by persons to whom the Navy has been forced to grant security clearances against its will, *infra.* Nor, I trust, have I been influenced by the many current press accounts of convicted spies who escaped detection, and the accompanying criticisms of officials who failed to guard the nation's security interests.

**6.** The majority distinguished *Crofoot* and *McGean* on a basis that the employing agency did not play a part in creating the basis for removal. Though the Navy, broadly speaking, is the "agency" here, the separation between TNRF and NCPC is not meaningfully distinct from the separation between the entities involved in *Crofoot* and *McGean.*

ance was denied by the NCPC, and then only *after* an opportunity to respond and appeal. There is not even an assertion that any Navy official involved in the clearance review process ever met Egan. Nor is there any basis for the assumption that the Navy could have an interest in the ridiculous enterprise of hiring Egan and then scheming to deny itself his services by "arbitrarily" denying him a clearance.

Egan does not, and could not, claim that the Navy acted in "bad faith" in denying him a clearance, and there is nowhere in the record even a whiff of the "well-nigh irrefragable proof" required to establish such bad faith. *See Kalvar Corp., Inc. v. United States,* 211 Ct.Cl. 192, 543 F.2d 1298, 1301–02 (1976), *cert. denied,* 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977).

The conjecture that Navy officials might act arbitrarily is not only unwarranted, it is far too weak a reed on which to rest a determination that MSPB must decide which employees of the armed forces should be granted security clearances. Given that the responsibility is the Navy's, and given the system of high level, objective, impersonal, decisionmaking employed by the Navy in carrying out that responsibility, including the employee's chance to respond and to appeal to higher authority within the agency, I can see no reason why, under those circumstances, the Navy should not be allowed to exercise its *judgment* in exercising *its* authority to grant or deny security clearances.

Moreover, the majority engages in no balancing of the potential risk it imagines (arbitrary denials) with the actual risk it creates (board and court interference in security decisions).

### *Egan is Already "Protected"*

The majority slides too easily by the fully adequate due process protections provided Egan under the Navy's regulation, OPNA-VINST 5510.1F, which, it is undisputed, the Navy followed to the letter. NCPC notified Egan in writing of the intent to deny him a security clearance, gave Egan all the reasons and access to all information on which that intent was based, and afforded Egan an opportunity to respond. Egan did so through a representative and in writing, not challenging the facts cited by the Navy but disagreeing with the Navy's judgment and arguing that he should be granted a clearance. NCPC considered Egan's response and notified Egan of his final decision to adhere to the denial, again citing reasons. Egan was notified in writing of his right to appeal to higher authority within the Navy (to the Assistant Deputy Chief of Naval Operations). From the record, Egan declined to file such an appeal, but proceeded promptly to MSPB.

The majority apparently believes Egan must have a full evidentiary hearing on whether he should be granted a security clearance, even though there is no material fact issue to resolve. In any case, due process does not require such a hearing. *Cafeteria & Restaurant Worker's Union, Local 473, AFL–CIO v. McElroy,* 367 U.S. 886, 894–99, 81 S.Ct. 1743, 1748–50, 6 L.Ed.2d 1230 (1961).

Moreover, the majority incorrectly implies that Egan would get more "process" if the Navy had proceeded under § 7532. Egan was given a right to appeal under OPNAVINST 5510.1F not available under § 7532. Egan was given a right to a full statement of reasons that is available under § 7532 only if national security considerations "permit". It is true that § 7532 provides for a hearing, but as indicated above, a hearing is not required in Egan's case.

In denying Egan a clearance, the Navy followed Executive Order 10450, which treats a security clearance for what it is, a grant of trust, requiring an *affirmative determination* that *granting* a clearance would be *clearly consistent* with the interests of national security, and requiring "an overall, common sense determination based on all available information."

As would any judge, I join the majority's desire that Egan receive a "full and fair consideration of his case." But, assuming he has a "case" for a security clearance, he

has had precisely that. After completion of the OPNAVINST process, there is nothing more to consider. There is no fact dispute and no law to apply to the Navy's judgment. *All* that remains is the possible substitution of MSPB's judgment.

Egan had no "right" to receive a security clearance. Because a clearance was a condition precedent to his job retention, it can be argued that Egan had a right not to be denied a clearance without due process (i.e., "arbitrarily"). *That* right was fully protected here.

### The Majority's Transfer of Authority and Responsibility

The authority to grant or deny a security clearance is committed to the sound discretion of executive agency heads. *See* Exec. Order 10450, 3 C.F.R. 936 (1953 Comp.) *reprinted as amended in* 5 U.S.C. § 7311 (1982) note:

> Sec. 2 The head of each department and agency of the Government shall be responsible for establishing and maintaining within his department or agency an effective program to insure that the employment and retention in employment of any civilian officer or employee within the department or agency is clearly consistent with the interests of the national security.

It is to me clear that, if this court compels MSPB to determine the "reasonableness" of security clearance determinations, the result is to transfer the sound discretion to grant or deny security clearances from the head of the executive agency concerned (Navy) to another, and less qualified, executive agency (MSPB). The majority cites no authority, and none exists, for the notion that security decisions of one executive agency should be reviewed, and occasionally overturned, by another executive agency.

The majority's decision will necessarily, and grievously, impair not only an independent operation of the armed services and other executive agencies and departments,

it will dilute the responsibility the President placed on them to insure that civilian employment is "clearly consistent with the interests of national security". Indeed, as described below, the majority's decision will effectively gut Executive Order No. 10450.

MSPB properly understood the President's order committing security clearance matters to the sound discretion of the department or agency as requiring MSPB, as an administrative tribunal, to exhibit a deference to military judgments on security clearances not unlike that traditionally exhibited by courts in relation to matters within military purview. *Cf. Williams v. Secretary of the Navy,* 787 F.2d 552 (Fed. Cir.1986).

The majority's mandate that MSPB make its own judgment on whether a security clearance should be denied or granted transfers the right to judge from the expert, authorized agency to MSPB and this court, both of which lack the needed individual and institutional competence. It also runs clearly contrary to well-established principles of deference owed national security determinations of executive agencies. As below indicated, it also runs contrary to the jurisprudence of this court.

### MSPB "Jurisdiction"

The majority's facile leap, from the board's general jurisdiction to review removals to the notion that the exercise of that jurisdiction must include authority to review the reasonableness of security judgments, is unnecessary and unwarranted.

Hence the majority's statement that there is "no indication that Congress intended this type of removal action to be exempt" is irrelevant.

The majority rests on the statutory jurisdiction of the board to review removals. But no one is arguing that question. That MSPB jurisdiction is present (because employment is affected), however, is not controlling.[7] MSPB recognized that it *had*

---

7. The majority makes much of the "availabili-ty" of § 7532 to the Navy, and that its use

jurisdiction to consider Egan's removal, and it *exercised* that jurisdiction, determining that Egan had not been denied due process. Though the board referred to "jurisdiction" to review the "underlying national security considerations inherent in security clearance determinations," it had to be referring to the *scope* of the jurisdiction it was in fact exercising. Indeed, the majority at one point recognizes that the issue before us is not "jurisdiction" but the "scope and standard of review" MSPB should exercise.

As this court has so often said, MSPB has only the jurisdiction Congress granted it. *See, e.g., Cowan v. U.S.*, 710 F.2d 803, 805 (Fed.Cir.1983). Having never specifically granted MSPB jurisdiction to conduct hearings on security clearances, Congress has not signalled an intent that MSPB should use the jurisdiction it was granted as authority to inject itself into that sensitive area committed to the Executive branch. This court is not authorized, of course, to grant MSPB a jurisdictional scope so broad.

That a claim of denial of due process is within the scope of MSPB review in this case is undisputed. MSPB agreed that it should, and did, review Egan's removal to insure that it was accompanied by due process. Egan does not assert a failure of the Navy to follow its regulations or any statute. As MSPB correctly observed, "there is present within the agency or the applicable entity a procedure for affording at least minimal due process protections, i.e., notice of the agency's determination, a statement of its reasons in support of the determination, and an opportunity for the affected individual to be heard." 28 M.S.P.R. at 519, *citing inter alia DeSarno v. Department of Commerce*, 761 F.2d 657, 660 (Fed.Cir.1985), and *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985).

The majority lists a first category of cases in which the scope of MSPB's review was not restrained, and a second category of cases in which that scope was restrained. The second category contained the only cases involving underlying decisions of the armed services. Yet the majority elects to drop the present case, involving an underlying decision of an armed service, into the *first* category, without telling us *why* (except fear of arbitrariness) it should not be placed in the *second* category.

This court has affirmed MSPB's recognition of restraints on the *scope* of MSPB's exercise of its jurisdiction in appropriate circumstances. *See, e.g., Buriani v. Department of the Air Force*, 777 F.2d 674, 677 (Fed.Cir.1985) (loss of employment-controlling active air reserve status because of failure to attain promotion not reviewable); *Zimmerman v. Department of the Army*, 755 F.2d 156, 157 (Fed.Cir.1985) ("the Board does not have the jurisdiction to examine military assignments and transfers"); *see also Schaffer v. Department of the Air Force*, 8 MSPB 631, 9 M.S.P.R. 305 (1981), *aff'd*, 694 F.2d 281 (D.C.Cir.1982). Considerations compelling still greater restraint are implicated when it is suggested that MSPB should affirm or reverse on the merits decisions of military authorities made in a due process procedure in the interests of national security.

That no one contests the foundation on which the majority builds, i.e., that MSPB has jurisdiction to review all matters within its jurisdiction, including removal actions. 5 U.S.C. §§ 1205(a), 7512, and 7701, does *not* mean that in reviewing a removal action, the board must review the merits of all agency actions which preceded or, indeed, precipitated the removal. The majority recognizes that this court has repeatedly so stated. *Bacon v. Department of*

---

would enable the Navy to escape MSPB review of its security clearance denials. No recognition is given, however, to the limitation of § 7532 to employees with "permanent" or "indefinite" appointments, and the question of its applicability to Egan whose appointment

was *conditional*. That the Navy did not argue inability to use § 7532 is no basis for punishing it by subjecting its judgments on security clearances to second guessing by MSPB, or for disregarding the arguments it did make.

*Housing and Urban Development,* 757 F.2d 265, 269–70 (Fed.Cir.1985) (no MSPB authority to probe mental processes of agency head for reasons he conducted reduction-in-force); *Madsen v. Veterans Administration,* 754 F.2d 343 (Fed.Cir.1985) (in reduction-in-force related adverse action, no MSPB power to review merits of agency's prior classification of bumping employee or his qualifications); *see also Crofoot v. Government Printing Office,* 21 M.S.P.R. 248, 252 (1984), *rev'd on other grounds,* 761 F.2d 661, 665 (Fed.Cir.1985) (MSPB does not re-examine reasons behind criminal conviction); *McGean v. National Labor Relations Board,* 15 M.S.P.R. 49, 53 (1983); *Buriani, supra.*

The facts and reasoning in *Zimmerman* and *Buriani,* make clear that there is no basis whatsoever for distinguishing them from the case before us.

Ms. Zimmerman sought reinstatement to her civilian position by arguing to the MSPB that the Army had erroneously denied a condition precedent to retention of that position (membership in her Reserve unit). This Court, however, gave short shrift to that argument. It flatly rejected the notion that the MSPB should have reviewed the reasons for the Army's denial of her Reserve status, saying "the Board does not have the jurisdiction to examine military assignments and transfers." *Zimmerman v. Department of the Army,* 755 F.2d at 157. It would appear impossible, respecting MSPB authority, to distinguish the military's denial of Ms. Zimmerman's condition precedent (Reserve status) from the military's denial of Egan's condition precedent (security clearance).

Mr. Buriani was a civilian employee of the Air Force who was not militarily promoted, a condition precedent to his maintaining the grade of his civilian position. This court limited the MSPB inquiry to whether Mr. Buriani was promoted, holding that any other inquiry would be an inappropriate "wide ranging collateral inquiry into the selection board." If MSPB may not inquire into the military's refusal to grant a civilian employee a military promotion, it strains credulity to suppose that it must inquire into the military's refusal to grant a civilian employee a security clearance.

Zimmerman, Buriani, and Egan were all civilian employees against whom adverse actions were taken because, and solely because, the military refused them a status required for job retention. MSPB heard all three cases, yet only in Egan's does the majority say MSPB must inquire into the military's refusal to grant the necessary status. Principled decisionmaking requires more than a mention of Zimmerman's and Buriani's Reserve status as justification for the present departure from this court's precedents.

### Separation of Powers

The majority ignores entirely the government's argument based on the constitutional principle of separation of powers. The protection of classified information is an executive responsibility flowing from the President's constitutional mandate to provide for the national defense. U.S. Const., Art. II, § 2.

> [I]t is the constitutional duty of the Executive—as a matter of sovereign prerogative and not as a matter of law as the courts know law—through the promulgation and enforcement of executive regulations, to protect the confidentiality necessary to carry out its responsibility in the fields of international relations and national defense.

*New York Times Co. v. United States,* 403 U.S. 713, 729–30, 91 S.Ct. 2140, 2149, 29 L.Ed.2d 822 (1971) (Stewart, J., concurring); *see United States v. Marchetti,* 466 F.2d 1309, 1315 (4th Cir.1972), *cert. denied,* 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972). In exercising his constitutional responsibility, the President reserved to heads of federal agencies, as above indicated, the decisions on who is entitled to hold a security clearance. Executive Order 10450, *supra.*[8]

---

**8.** Congress has granted to the secretaries of the military services, including the Navy,

Where, as here, no deprivation of a constitutional right or statutory violation is involved, the courts have declined to intrude into the sphere of Presidential responsibility for national defense, in recognition of the constitutionally mandated separation of powers. *See, e.g., Haig v. Agee,* 453 U.S. 280, 292, 101 S.Ct. 2766, 2774, 69 L.Ed.2d 640 (1981); *Gilligan v. Morgan* 413 U.S. 1, 7–11, 93 S.Ct. 2440, 2444–46, 37 L.Ed.2d 407 (1973); *Laird v. Tatum,* 408 U.S. 1, 14–15, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1971); *Orloff v. Willoughby,* 345 U.S. 83, 93–94, 73 S.Ct. 534, 539–40, 97 L.Ed. 842 (1953); *Buriani v. Department of the Air Force,* 777 F.2d 674, 676 (Fed.Cir.1985), *quoting Zimmerman v. Department of the Army,* 755 F.2d 156, 157 (Fed.Cir.1985); *Adams v. Laird,* 420 F.2d 230, 239 (D.C.Cir.1969), *cert. denied,* 397 U.S. 1039, 90 S.Ct. 1360, 25 L.Ed.2d 650 (1970); *Greene v. McElroy,* 254 F.2d 944, 953 (D.C.Cir.1958), *rev'd. on other grounds,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959).

Because the Constitution assigns national security matters to the Executive Branch, the courts have not developed the institutional competence to decide them. In *Greene v. McElroy,* 254 F.2d at 953, the court explained why it should not review the merits of an agency's security clearance revocation:

> There must be a "justiciable" controversy—one which the courts can finally and effectively decide, under tests and standards which they can soundly administer within their special field of competence. Here there is no such controversy. As we have seen, Greene makes no claim of lack of compliance by the Government with its own regulations. He attacks the Secretary's decision on its merits and as a matter of constitutional right. But for a court to hear de novo the evidence as to Greene's fitness to be assigned to a particular kind of confidential work would be a bootless task, involving judgments

remote from the experience and competence of the judiciary. Indeed, any meaningful judgment in such matters must rest on considerations of policy, and decisions as to comparative risks, appropriate only to the executive branch of the government.

The actual judgment on whether to grant or deny a security clearance requires specialized expertise, is predictive, is judgmental and neither factual nor legal, requires no knowledge of legal or Civil Service/Merit principles (because there "is no law to apply"), and rests on policy considerations and risk comparisons. The majority does not tell us why an MSPB presiding official, or MSPB itself, is better, or even equally, qualified to make that judgment than are the responsible military officials. "We are not in an area where absolutes obtain, and the grant or denial of security clearances is an inexact science at best. Those who have that responsibility have to do the best they can with what they have...." *Adams v. Laird,* 420 F.2d at 239.

### What Now?

The majority's too-easy dismissal of the agency's concern over its remedies (if MSPB reinstates Egan) is unfair. When the law is clear, judicial decisions certainly must not be controlled by results. But where, as here, no statute authorizes or requires MSPB to review security clearance judgments of the armed services, a court should not render a decision that it must do so with *no* regard for the havoc the court may thereby create. In the present case, the court should not simply finesse the Navy's question "what now"?

A moment's thought to consequences establishes that the majority's approach will engender absurd results. The presiding official, believing herself so empowered and qualified, held that despite Egan's criminal record and a history of alcohol dependence, the Navy's judgment that he

broad discretion regarding matters falling within their sphere to assure that the services may fulfill their assigned missions of protecting the national defense. *See* 10 U.S.C.

§§ 133, 5012, and 5031 (1982); *Cafeteria and Restaurant Workers' Union, Local 473, AFL–CIO v. McElroy,* 367 U.S. 886, 890, 81 S.Ct. 1743, 1746, 6 L.Ed.2d 1230 (1961).

should be denied security clearance was "unreasonable." If the MSPB, despite its non-expertise, decides that the Navy's clearance denial was "unreasonable", it would have to reverse Egan's removal and order the Navy to reinstate Egan as a repairman on its submarines (with consequent exposure of its secrets). Does the majority intend that MSPB *order* the Navy to grant Egan a security clearance? Why not, its denial having been found "unreasonable"? And, before the board reversed *Bogdanovicz* in this case, MSPB presiding officials repeatedly *did order* the Navy to grant security clearances. *See Skees v. Dept. of Navy*, No. PHO752 8410257, slip. op. at 13 (June 14, 1984); *Peterson v. Dept. of Navy*, No. BNO7528410257, slip. op. at 9 (Feb. 14, 1984); *Irving v. Dept. of Navy*, No. BNO7528410005, slip. op. at 9 (Feb. 3, 1984).

Where shall MSPB say the Navy erred in its denial? What criteria for granting or denying security clearances should *MSPB* establish? If MSPB sets forth no clear, all-encompassing criteria, how shall the Navy, or any armed service, or any executive agency, know when its grant or denial of a security clearance will pass muster at MSPB? Should any such MSPB criteria supplant that employed now by the Navy in OPNAVINST 5510.1F CH 4, 16–102?

If MSPB and this court are to be the final decisionmakers on whether and which employees should be trusted with our nation's security, how could the officials of the armed services rely on their judgment of whether granting a clearance would be "consistent with the interests of national security"? What objective facts can those responsible officials correctly cite to "prove by a preponderance of the evidence" that this or that employee *will* reveal defense secrets? How does one *prove* his *judgment* that a particular employee *might* disclose secrets?

It must be remembered that the *only* remedy which MSPB can grant is reinstatement of Egan in his job. In this regard,

this court has said it is appropriate to look to the authority Congress has provided in connection with relief. *See Electronic Data Systems Federal Corp. v. General Services Administration Board of Contract Appeals*, 792 F.2d 1569 (Fed.Cir. 1986); *United States v. Amdahl Corp.*, 786 F.2d 387 (Fed.Cir.1986). The majority unfairly avoids the limitation on the board's remedial authority by merely saying the issue of relief is not ripe.

If the presiding official's determination be reinstated on remand, it is clear that the Navy must either grant or again deny a security clearance to Egan. In light of the responsibility it bears, it is inconceivable that the Navy would grant Egan a clearance while remaining convinced of his unreliability. If the Navy may persist in denying Egan a clearance, must it nonetheless continue to employ him in the submarine repair work for which he was conditionally hired? How could the Navy do that (except by the impossible step of removing the security clearance requirement for all persons doing that work and thereby made privy to Navy secrets)? If the Navy retains a security clearance for the job, and does not give Egan his original job and a clearance, must the Navy find him an equal-pay job that does not require a clearance? Must it do so without regard for Egan's qualifications for such other job? It being established that there are no such other jobs, must the Navy pay Egan for not working (because he has no clearance)?

The foregoing and similar considerations make it impossible for me to imagine how the result reached by the majority can be seen as serving "to promote the efficiency of the service." Together they force this dissent.

### Conclusion

MSPB correctly held that "in an adverse action over which the Board has jurisdiction and which is based substantially on the

agency's revocation or denial of a security clearance, the Board has no authority to review the agency's stated reasons for the security clearance determination." That holding was supported by compelling, sound considerations of long-established deference and public policy. It should be affirmed.